# ATTACHMENT 1

Trials@uspto.gov  
571.272.7822

IPR2015-00059; Paper 18  
Entered: April 27, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

HUGHES NETWORK SYSTEMS, LLC and
HUGHES COMMUNICATIONS, INC.,
Petitioner,

v.

CALIFORNIA INSTITUTE OF TECHNOLOGY,
Patent Owner.

_____

Case IPR2015-00059
Patent 7,916,781 B2

_____

Before KALYAN K. DESHPANDE, GLENN J. PERRY, and
TREVOR M. JEFFERSON, *Administrative Patent Judges*.

PERRY, *Administrative Patent Judge*.

DECISION  
Institution of *Inter Partes* Review  
*37 C.F.R. § 42.108*

IPR2015-00059
Patent 7,916,781 B2

# INTRODUCTION

### A. Background

Hughes Network Systems, LLC and Hughes Communications, Inc.[1] (collectively "Petitioner") filed a Petition requesting an *inter partes* review of claims 1–7, 13–16, and 19 of U.S. Patent No. 7,916,781 B2 (Ex. 1005, "the '781 patent"). Paper 4 ("Pet.")[2]. California Institute of Technology ("Patent Owner") timely filed a Preliminary Response. Paper 13 ("Prelim. Resp."). We have authority to determine whether to institute an *inter partes* review under 35 U.S.C. § 314; 37 C.F.R. § 42.4(a). Upon consideration of the Petition and the Preliminary Response, we determine that Petitioner has established a reasonable likelihood of prevailing as to claims 1 and 2 as challenged in the Petition. Accordingly, we institute an *inter partes* review of claims 1 and 2 of the '781 patent.

### B. Related Proceedings

Petitioner states that the '781 Patent (Ex. 1005) is involved in a pending lawsuit titled *California Institute of Technology v. Hughes Communications, Inc.*, No. 13-CV-07245 (CACD) ("the Lawsuit"). *See* Ex. 1015. The Lawsuit includes the following patents: (i) U.S. Patent No. 7,116,710; (ii) U.S. Patent No. 7,421,032; (iii) U.S. Patent No. 7,916,781; and (iv) U.S. Patent No. 8,284,833.

---

[1] EchoStar Corporation is named in the Petition as the parent of Hughes Satellite Systems Corporation, which is the parent of Hughes Communications, Inc. Pet. 1. Both EchoStar Corporation and Hughes Satellite Systems Corporation are real parties in interest. The record is still being developed as to whether Dish is an unnamed real party in interest.
[2] "Pet." refers to the corrected petition filed October 30, 2014 (Paper 4).

IPR2015-00059
Patent 7,916,781 B2

Petitioner filed additional Petitions for Inter Partes review challenging other patents of the patent family. Pet. 1.

## THE '781 PATENT

### A. Background and Context

We understand that error correcting codes are used to communicate information across a noisy communication channel. They enable the recovery of a transmitted message that may have become distorted by channel noise. To prepare a message for transmission, it is parsed into groups of message bits that are "encoded" into "codewords" by adding redundant information to them.[3] The codewords are transmitted over the communication channel and are received at another location, where the codewords are "decoded" into the original message. No single coding scheme is optimal for all communication channels. Also, there are design tradeoffs between the use of complex codes, which permit better error correction, and less complex codes, which are easier to decode. This has led to the development of many different encoding/decoding schemes. The '781 patent describes one such scheme.

### B. The '781 Patent Invention

The '781 patent describes the serial concatenation of interleaved convolutional codes forming turbo-like codes. Ex. 1005, Title. It explains some of the prior art with reference to its Figure 1, reproduced below.

---

[3] For example, a message bits "10011" may be encoded into a codeword "100111" by adding a "parity" bit "1" to the original message.

3

IPR2015-00059
Patent 7,916,781 B2



FIG. 1
(Prior Art)

Figure 1 is a schematic diagram of a prior "turbo code" system. Ex. 1005, 2:20–21. The '781 patent specification describes Figure 1 as follows:

> A block of k information bits is input directly to a first coder 102. A k bit interleaver 106 also receives the k bits and interleaves them prior to applying them to a second coder 104. The second coder produces an output that has more bits than its input, that is, it is a coder with rate that is less than 1. The coders 102, 104 are typically recursive convolutional coders.
>
> Three different items are sent over the channel 150: the original k bits, first encoded bits 110, and second encoded bits 112. At the decoding end, two decoders are used: a first constituent decoder 160 and a second constituent decoder 162. Each receives both the original k bits, and one of the encoded portions 110, 112. Each decoder sends likelihood estimates of the decoded bits to the other decoders. The estimates are used to decode the uncoded information bits as corrupted by the noisy channel.

Ex. 1005, 1:44–60.

A coder 200, according to a first embodiment of the invention, is described with respect to Figure 2, reproduced below.

4

IPR2015-00059
Patent 7,916,781 B2



FIG. 2

Figure 2 of the '781 patent is a schematic diagram of coder 200.

> The coder 200 may include an outer coder 202, an interleaver 204, and inner coder 206. . . . The outer coder 202 receives the uncoded data [that] may be partitioned into blocks of fixed size, [e.g.] k bits. The outer coder may be an (n,k) binary linear block coder, where n>k. The coder accepts as input a block u of k data bits and produces an output block v of n data bits. The mathematical relationship between u and v is $v=T_0 u$, where $T_0$ is an nxk matrix, and the rate[4] of the coder is k/n.
>
> The rate of the coder may be irregular, that is, the value of $T_0$ is not constant, and may differ for sub-blocks of bits in the data block. In an embodiment, the outer coder 202 is a repeater that repeats the k bits in a block a number of times q to produce a block with n bits, where n=qk. Since the repeater has an irregular output, different bits in the block may be repeated a different number of times. For example, a fraction of the bits in the block may be repeated two times, a fraction of bits may be repeated three times, and the remainder of bits may be repeated four times. These fractions define a degree sequence or degree profile, of the code.
>
> The inner coder 206 may be a linear rate-1 coder, which means that the n-bit output block x can be written as $x=T_I w$, where $T_I$ is a nonsingular nxn matrix. The inner coder 210 can have a

---

[4] The "rate" of an encoder refers to the ratio of the number of input bits to the number of resulting encoded output bits related to those input bits.

5

IPR2015-00059
Patent 7,916,781 B2

> rate that is close to 1, e.g., within 50%, more preferably 10% and perhaps even more preferably within 1% of 1.

Ex. 1005, 2:40–3:2. Codes characterized by a regular repeat of message bits into a resulting codeword are referred to as "regular repeat," whereas codes characterized by irregular repeat of message bits into a resulting codeword are referred to as "irregular repeat." The second ("inner") encoder 206 performs an "accumulate" function. Thus, the two step encoding process illustrated in Figure 2, including a first encoding ("outer encoding") followed by a second encoding ("inner encoding"), results in either a "regular repeat accumulate" ("RRA") code or an "irregular repeat accumulate" ("IRA") code, depending upon whether the repetition in the first encoding is regular or irregular.

Figure 4 of the '781 patent is reproduced below.



FIG. 4

Figure 4 shows an alternative embodiment in which the first encoding is carried out by a low density generator matrix. Low density generator matrix (LDGM)[5] codes are a special class of low density parity check codes that allow for less encoding and decoding complexity. LDGM codes are

---

[5] We understand that a "generator" matrix (typically referred to by "G") is used to create (generate) codewords. A parity check matrix (typically referred to by "H") is used to decode a received message.

6

IPR2015-00059
Patent 7,916,781 B2

systematic linear codes generated by a "sparse" generator matrix. No interleaver (as in the Figure 2 embodiment) is required in the Figure 4 arrangement because the LDGM provides scrambling otherwise provided by the interleaver in the Figure 2 embodiment.

### C. Illustrative Claim

All of the claims of the '781 patent are directed to methods of coding. Among the challenged claims, claims 1, 13, and 19 are independent. Claim 13 and its dependent claims are directed to encoding methods that produce irregular repeat accumulate codes. Claim 1, which does not require irregularity, is illustrative and is reproduced below.

> 1. A method of encoding a signal, comprising:
>
> [a] receiving a block of data in the signal to be encoded, the block of data including information bits;
>
> [b] performing a first encoding operation on at least some of the information bits, the first encoding operation being a linear transform operation that generates L transformed bits; and
>
> [c] performing a second encoding operation using the L transformed bits as an input, the second encoding operation including an accumulation operation in which the L transformed bits generated by the first encoding operation are accumulated,
>
> [d] said second encoding operation producing at least a portion of a codeword, wherein L is two or more.

(bracketed claim limitation references added)

7

IPR2015-00059
Patent 7,916,781 B2

## ALLEGED GROUNDS OF UNPATENTABILITY

Petitioner contends that the challenged claims are unpatentable on the following specific grounds.[6]

| Reference(s) | Basis | Claim(s) challenged |
|---|---|---|
| Divsalar[7] | 35 U.S.C. § 102 | 1–2 |
| Ping[8] | 35 U.S.C. § 102 | 1–3, 5–7, and 19 |
| Ping and Patterson[9] | 35 U.S.C. § 103 | 4 |
| Ping and Luby[10] | 35 U.S.C. § 103 | 2, 3, 5–7, and 13-15 |
| Ping, Luby, and Patterson | 35 U.S.C. § 103 | 4 and 16 |

## ANALYSIS OF CLAIM CHALLENGES

A. *Claim Construction*

Claim constructions presented in this Decision are preliminary in that they are based on the record developed thus far, prior to Patent Owner's

---

[6] Petitioner supports its challenge with Declaration of Henry D. Pfister, Ph.D. (Ex. 1010) ("Pfister Decl."). *See infra*.

[7] Dariush Divsalar, et al., *Coding Theorems for "Turbo-Like" Codes*, 1998 THIRTY-SIXTH ANNUAL ALLERTON CONFERENCE ON COMMUNICATION, CONTROL, AND COMPUTING 201–209 (Ex. 1011, "Divsalar").

[8] Li Ping et al., *Low Density Parity Check Codes with Semi-Random Parity Check Matrix*, 35 IEEE ELECTRONICS LETTERS, 38–39 (1999) (Ex. 1014, "Ping").

[9] Patterson, U.S. Patent No. 4,623,999, application filed June 4, 1984 (Ex. 1027, "Patterson").

[10] Luby et al., U.S. Patent 6,081,909, application filed November 6, 1997 (Ex. 1016, "Luby").

8

IPR2015-00059
Patent 7,916,781 B2

formal response. Constructions may change as the record more fully develops.

In an *inter partes* review, claim terms of an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

### 1. "linear transformation" (claim 1)

Petitioner states that Divsalar demonstrates linear transformation within its broadest reasonable construction, but does not construe the term. Patent Owner asserts that Petitioner did not construe the term, but does not offer its own construction. We construe the term in order to apply the references.

The term "linear transformation" is used in the context of a linear transformation between two vector spaces. For purposes of this decision, we adopt a linear algebra definition[11] as follows:

A linear transformation is one that obeys the laws of linear algebra including distributive and associative properties, e.g. the transform of vectors a+b is equal to the transform of a + the transform of b. The

---

[11] This definition is explained by "Wolfram MathWorld" at http://mathworld.wolfram.com/lineartransformation.html.

9

IPR2015-00059
Patent 7,916,781 B2

transform of x (a scalar) times a vector y is equivalent to x times the transform of vector y.

### 2. *additional claim terms*

For purposes of this decision, we find it unnecessary to construe additional claim terms.

### B. *Divsalar (Ex. 1011)*

#### 1. *Divsalar as a Publication*

The cover page of the Divsalar document is reproduced below.



The cover page includes a photograph of the "Allerton House" in which the Allerton Conference is held. It also includes the date range of the conference and indicates sponsorship information.

Petitioner states that Divsalar was "published no later than April 30,

10

IPR2015-00059
Patent 7,916,781 B2

1999 at the University of Texas library." In support, Petitioner proffers the declaration testimony of the University of Texas librarian (Ex. 1064), including an acquisition record pasted into an email. According to Dr. Pfister, Petitioner's declarant, the Allerton Conference is generally regarded as one of the main conferences in the field of information theory and communications. Ex. 1010 ¶ 29.

Patent Owner argues that Petitioner has not established that Divsalar is a publication within the meaning of 35 U.S.C. § 311(b). Patent Owner states that Divsalar is "undated" (Prelim. Resp. 19) and that the library acquisition record does not state that the paper was actually shelved or otherwise displayed and accessible to those of "ordinary skill." *Id.* at 22.

According to the Divsalar cover page, it was presented at the Allerton Conference held Sept 23–25, 1998. Ex. 1011, 1. The acquisition record of the University of Texas indicating acquisition in April 1999 lends credence to the actual presentation and publication of the paper at the September 1998 Allerton Conference. *See* attachment to Declaration of Robin Fradenburgh, Ex. 1064. Given Dr. Pfister's testimony that the Allerton Conference is the premier conference for information theorists, we find sufficient evidence to establish Divsalar as having been presented and published as required by 35 U.S.C. § 311(b).

We note that Divsalar is listed as being of record among the "References Cited" in the '781 patent itself. It was not of record in the prosecution of its grandparent application (issued as the '710 patent).

Accordingly, we are persuaded by Petitioner and the supporting evidence that Divsalar is prior art for the purposes of this Decision. Patent Owner may rebut Petitioner's explanation and supporting evidence with evidence that Divsalar was not presented and published as part of the

11

IPR2015-00059
Patent 7,916,781 B2
Allerton Conference.

### 2. *Challenge to Claims 1 and 2 based on Divsalar*

Divsalar describes a rate-1 accumulate convolutional encoder known as a "repeat-accumulator" or "RA" code. Ex. 1010 at para. 31–32. Petitioner relies on Divsalar's Figure 3, reproduced below.



Figure 3 of Divsalar describes an encoder for a ($_qN$, $N$) repeat and accumulate code. Ex. 1011, 7. The numbers above the input-output lines indicate the length of the corresponding block, and those below the lines indicate the weight of the block. *Id.*

Petitioner argues that Divsalar's "rate 1/q repetition" followed by a permutation constitutes a linear transform operation as required by claim 1. Pet. 14. Patent Owner disagrees, arguing that Petitioner has not demonstrated why this is so. Prelim. Resp. 23–27. Patent owner draws a distinction between the '781 patent being directed to "irregular" repeat codes and Divsalar being directed to "regular" repeat codes. Patent Owner correctly points out that Divsalar does not disclose an encoding operation utilizing irregular repetition. Prelim. Resp. 26. Patent Owner argues that the specification explains how irregular coding can be achieved. Pet. 26. Patent Owner points to a passage of the '781 patent specification including the statement that "'[t]he outer coder may be an (n,k) binary linear block coder,'" and describes the relationship between the input and output data in

12

mathematical terms. Pet. 24 (citing Ex. 1005, 2:47–53). We agree with Patent Owner that the specification explains how irregular coding is achieved.

However, we do not read claim 1 as being limited to irregular repeat coding. Claim 1 requires "performing a first encoding operation on at least some of the information bits, the first encoding operation being a linear transform operation that generates L transformed bits." The first encoding can be on "at least some" of the information bits. Thus, it could also be on all of the information bits. Also, according to the claim, the first encoding operation must produce "L" transformed bits. There is no explanation in the claim as to the relationship of "L" to the incoming block of bits being transformed. All the reader of claim 1 is told, at the end of the claim, is that L is 2 or more. Thus, claim 1 could produce a regular repeat code by repeating all of the information bits to generate L (more than 2) transformed bits. If claim 1 is limited to producing irregular codes, it has not yet been made clear to us what language so limits the claim.

If claim 1 were limited to "irregular" codes, Patent Owner's position would have more merit. However, claim 1 embraces more than just "irregular" repeat codes. It includes first and second encoding operations that may produce "regular" and "irregular" repeat codes. Thus, on this record, Patent Owner's argument does not appear to be commensurate in scope with the actual language of claim 1.

Claim 2 depends from claim 1 and further requires that a codeword resulting from the claim 1 encoding process includes parity bits. Divsalar adds parity bits by outputting more bits than are input. *See* Divsalar's Figure 3 showing a first encoding having a rate less than 1. Nothing in claim 2 limits it to producing irregular repeat codewords.

13

IPR2015-00059
Patent 7,916,781 B2

For the above-stated reasons we conclude that on this record Petitioner has demonstrated it is reasonably likely to prevail in challenging claims 1 and 2 as anticipated by Divsalar.

C. *Challenges based on Ping (Ex. 1014)*

1. *What Ping describes*

Ping generally relates to low density parity check (LDPC) codes that have been known since 1962. *See* Ex. 1014, 7 n.1. It was known to randomly generate matrix elements using a process referred to as "Gaussian elimination." Ex. 1014, 6.[12] Ping describes generating LDPC using a semi-random parity check matrix. Ex. 1014, Title. Some of the matrix elements are determined randomly and some of the matrix elements are deterministic. *Id.* at 6. Ping states that a fully random matrix is best, but leads to codes that are not practical to decode. *Id.* Ping's theorizes that by only semi-randomizing the parity check matrix, one can achieve a code scheme that is almost as good as that which can be obtained by a fully randomized matrix and at considerable less encoding complexity. *Id.* Ping randomly selects a portion of the coding matrix and determines the rest of the matrix by formula, thus deterministically rather than randomly. *Id.*

2. *Anticipation Challenges based on Ping*

Claim 1 does not require an irregular repeat (the only independent claim requiring irregular repeat is claim 13). Petitioner reads the challenged claims on Ping at Pet. 16–31. This portion of the Petition is supported by the Pfister Report (Ex. 1010¶¶ 49–60.

---

[12] We refer to exhibit page numbers rather than pages number of the cumulative publication in which the article is positioned.

14

IPR2015-00059
Patent 7,916,781 B2

According to Petitioner, Ping discloses a low-density generator matrix with an accumulate encoder. Pet. 17 (citing Ex. 1010 ¶ 51).

With regard to the claim 1 "first encoding," Petitioner provides a lengthy quote from Ping at page 6 of Exhibit 1014. Pet. 18–19. Petitioner then asserts that Ping's encoding procedure, reproduced above, is a low-density generator matrix (LDGM) encoding combined with an accumulate encoder. Pet. 19 (citing Ex. 1010 ¶ 55). Petitioner states that equation (4) of Ping (Ex. 1010, 56) performs an accumulation to determine parity bits. Petitioner further states that the summation term used to calculate each parity bit is a linear transform operation. *Id.* Petitioner relies on the assertion that one of ordinary skill would recognize that the (n-k) term (allegedly corresponding to the claimed "L" bits) would be two or more. Pet. 21 (citing Ex. 1010 ¶ 59). Petitioner's argued mathematical equivalence further relies upon a person of ordinary sill recognizing that "any reasonable configuration of the encoder of Ping would use (n-k) much greater than two. Pet. 21 (citing Ex. 1010 ¶ 59).

Patent Owner argues that Petitioner has not carried its burden. First, according to Patent Owner, Ping improperly equates Ping's LDPC codes with the '781 use (Fig. 4) of a low density generator matrix (LDGM) in order to imply that Ping meets limitations [b] and [c] of claim 1. Prelim. Resp. 28. Patent Owner argues that Petitioner and Dr. Pfister jump to the unexplained conclusory statement that the LDGM code definition is given by "basic coding theory" without any explanation as to why this is so. *Id*. at 29.

Although Patent Owner does not offer an alternative analysis. We nonetheless do not find helpful Petitioner's unexplained conclusory remarks regarding Ping's equivalency to claim 1. Absent sufficient explanation and

15

IPR2015-00059
Patent 7,916,781 B2

evidence, we are not persuaded by Petitioner that Ping's LDPC codes meets limitation [b] and [c] of claim 1. Accordingly, we are not persuaded that there is a reasonable likelihood that Petitioner will prevail with respect to claim 1.

### 3. *Obviousness Challenges based on Ping, Patterson, and Luby*

The additional references (Patterson and Luby) do not overcome the flaws identified above with respect to Ping. Luby is relied upon for its description of irregularizing known codes. Pet. 9–10. Patterson is relied upon for its description of codewords comprising information bits followed by parity bits. Pet. 10–11.

Petitioner does not explain why one of ordinary skill would have made the assumptions referred to above with respect to the anticipation challenges based on Ping. Luby and Patterson do not overcome this. We therefore conclude that Petitioner is not reasonably likely to succeed in its obviousness challenges based upon Ping and additional references.

### SUMMARY

For the foregoing reasons, we determine that the information presented in the Petition establishes a reasonable likelihood that Petitioner would prevail on at least one alleged ground of unpatentability with respect to claims 1 and 2 of the '781 patent. The Board has not made a final determination on the patentability of any challenged claims.

### ORDER

For the reasons given, it is

ORDERED that *inter partes* review of the '781 patent is hereby instituted as to all the challenged claims as follows: claims 1 and 2 as anticipated by Divsalar;

16

IPR2015-00059
Patent 7,916,781 B2

FURTHER ORDERED that no ground other than those specifically granted above is authorized for the *inter partes* review; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial on the grounds of unpatentability authorized above; the trial commences on the entry date of this Decision.


PETITIONER:

Eliot D. Williams
G. Hopkins Guy
Baker Botts, LLP
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com


PATENT OWNER:

Michael T. Rosato
Matthew A. Argenti
Wilson Sonsini Goodrich & Rosati
mrosato@wsgr.com
margenti@wsgr.com